**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**PINE BLUFF DIVISION**

TERRICK TERRELL NOONER                                        PETITIONER

v.                              Case No. 5:08CV00003  JLH

LARRY NORRIS, Director,
Arkansas Department of Correction                            RESPONDENT

## <u>OPINION AND ORDER</u>

Terrick Terrell Nooner was convicted in state court of, and sentenced to death for, the murder

of Scot Stobaugh.  Nooner's conviction and sentence were affirmed on direct appeal.  *Nooner v.*

*State*, 322 Ark. 87, 907 S.W.2d 677 (1995), *cert. denied*, 517 U.S. 1143 (1996).  Nooner filed a

petition for postconviction relief pursuant to Rule 37 of the Arkansas Rules of Criminal Procedure.

That petition was denied, and the Supreme Court of Arkansas affirmed the denial of the petition.

*Nooner v. State*, 339 Ark. 253, 4 S.W.3d 497 (1999).  Nooner sought a petition for writ of habeas

corpus in this Court, which was denied.  The Eighth Circuit affirmed.  *Nooner v. Norris*, 402 F.3d

801 (8th Cir. 2005), *cert. denied*, 547 U.S. 1137 (2006).  Nooner then obtained authorization from

the Eighth Circuit to file a second or successive petition for writ of habeas corpus.  Nooner's second

petition for writ of habeas corpus is now ready for disposition.

Nooner's second petition alleges two claims for relief.  First, Nooner asserts that newly

discovered evidence shows that he is actually innocent of the murder of Scot Stobaugh.  Secondly,

Nooner argues that his conviction and sentence are the product of prosecutorial misconduct.

Nooner's claim of actual innocence is based on statements by Robert L. Rockett, III, Nooner's

accomplice, that he (Rockett) rather than Nooner murdered Stobaugh; a statement by Antonia

Kennedy (now Spencer) recanting her testimony against Nooner at his trial; and an estimate of the

murderer's height made by an expert in photogrammetric computer vision analyzing a surveillance video and concluding that the murderer was 66.1 inches tall, which is Rockett's height, rather than 69 inches tall, which is Nooner's height.

The Court has conducted two evidentiary hearings on Nooner's claim of actual innocence. Much of what Nooner claims to be newly discovered evidence is not new nor does it show that Nooner is actually innocent. Nooner's claim for prosecutorial misconduct fails as a basis for a second or successive petition because the factual predicates could have been discovered previously through the exercise of due diligence. Therefore, Nooner's petition for writ of habeas corpus is denied.

## I.

Scot Stobaugh was murdered a few minutes past 1:30 a.m. on March 16, 1993, in the FunWash laundromat on West Markham Street in Little Rock. He was shot seven times. Seven .22 caliber shell casings were found on the floor close to the body.

The FunWash laundromat had three surveillance cameras in operation at the time of the shooting. The recording system was a switched time lapse system that alternately recorded different views on one tape. The tape is of poor quality. The first of the cameras was located near the entrance, and it recorded in color; the second, which recorded in black and white, was at the front of the laundromat and faced toward the rear; and the third camera, which also recorded in black and white, was located at the rear of the laundromat and faced the front of the laundromat, recording an aisle along which the dryers were located. The front of the laundromat consisted of glass windows from floor to ceiling.

The third camera recorded a portion of the confrontation of Stobaugh by the murderer. Stobaugh is seen walking away from the front of the laundromat toward the rear, followed by the murderer. The murderer was wearing a baseball cap and a jacket. As they approached the rear of the laundromat, Stobaugh and the murderer turned into an aisle between two rows of washing machines. Stobaugh left the line of sight of the surveillance camera, so the actual murder was not videotaped, but one frame of the video shows the murderer with his right hand extended forward out of the line of sight of the camera and the empty left hand extended backward as though he was doing something with his right hand and using his left hand for balance. Stobaugh's body was found two hours later by a security officer from the University of Arkansas for Medical Sciences, which is located across the street from the FunWash laundromat.

Several days after Stobaugh was murdered, while in the custody of the Jacksonville Police Department and being interviewed on suspicion of having committed an armed robbery and murder at a convenience store, Rockett told an officer of the Jacksonville Police Department that he believed Nooner had killed a man in a laundromat. The officer of the Jacksonville Police Department terminated the interview and called in an investigator from the Little Rock Police Department, who interviewed Rockett about the Stobaugh murder. Rockett told the officer that he and Nooner were together on the night Scot Stobaugh was murdered, and they were driving a vehicle that Nooner had stolen. They were looking for someone to rob when they saw a white male get out of his car in the parking lot of the laundromat and go in. Nooner told Rockett, who was driving, to turn around and go back because he was going to rob the person who had entered the laundromat. Rockett stated that he pulled into the parking lot, Nooner got out, and he (Rockett) turned the vehicle around with the front pointing toward the street. Nooner went in and walked the victim toward the back of the

laundromat in between the washing machines and made him lie down.  Nooner then kicked or stomped the victim a couple of times and shot him seven times.  Nooner took the man's wallet, checkbook, Social Security card and $100 in cash.  Rockett stated that Nooner shot the man with a Ruger .22 caliber semiautomatic pistol that they had stolen.

Nooner and Rockett were both charged in connection with the murder of Scot Stobaugh.  Nooner went to trial in September 1993.  Rockett was not tried with Nooner, nor did he testify at Nooner's trial.  In January 1994, Rockett entered a plea of guilty to first degree murder in connection with the death of Scot Stobaugh.  He was sentenced to 65 years in prison consecutive to other sentences he was serving, which included a sentence of life without parole for the murder of Stacie Summers at a Stax Store in Jacksonville, Arkansas; a sentence of life imprisonment for aggravated robbery in Saline County, Arkansas; and a sentence of five years for robbery in Garland County, Arkansas.

The witnesses against Nooner included Antonia Kennedy, the sister of Terri Kennedy, a woman with whom Nooner had a relationship.  Antonia Kennedy had been with Nooner and Rockett when they committed crimes in Jonesboro and Saline County.  Antonia Kennedy testified that Nooner told her on the morning after the murder that he had killed a man in a laundromat.  According to Antonia Kennedy, Nooner said that he had been with Rockett, that they parked the vehicle outside the laundromat, and that he (Nooner) went inside, demanded money from the victim, and shot him.  Antonia Kennedy testified that she saw a checkbook in the car driven by Rockett and Nooner, and the checkbook had the name of Scot Stobaugh.  She further testified that Nooner had a Ruger .22 pistol.  On cross-examination, Antonia Kennedy testified that she had previously given a contrary statement to a private investigator retained by the defense.  She told the private

4

investigator that the statement that she had given to the police, which was consistent with her testimony at trial, was a lie.  She also testified that she had been in custody in Jonesboro when she first gave information implicating Nooner, and she was told if she gave that information the charges in Jonesboro would be taken care of.

Another witness against Nooner was Isaac Warren.  Warren testified that he had seen Nooner around the apartment shared by Antonia Kennedy and her sisters, Terri and Jazmar.  He spoke with Nooner about purchasing a Ruger .22 automatic pistol that Nooner owned.

Jazmar Kennedy, the sister of Terri and Antonia Kennedy, testified against Nooner.  She looked at photographs taken from the surveillance videotapes and testified that Nooner was the person in the videotape along with Scot Stobaugh.  She testified that she could recognize not only his face but also his clothing.  She said that he was wearing a University of Miami cap and a coat that belonged to her sister.

Nooner was also identified in the photographs by Johnny Martin, who had been at the apartment shared by Antonia, Terri, and Jazmar Kennedy.

Another witness against Nooner was Ronald Andrejack, a ballistics expert from the Arkansas Crime Laboratory.  Andrejack testified that the markings on the bullets were consistent with a .22 Ruger pistol and that he had found only one type of gun, a Ruger .22 pistol, that would have bullets with all of the characteristics of the bullets that were found at the scene.

The defense called two witnesses, Terri Kennedy and Nooner's stepfather, who testified that Nooner was in bed at his mother's and stepfather's house at the time Stobaugh was murdered.

## II.

As noted above, this is a second or successive petition for writ of habeas corpus that has been

authorized by the Eighth Circuit.  It is, therefore, governed by 28 U.S.C. § 2244(b)(2), which

provides:

> A claim presented in a second or successive habeas corpus application under section
> 2254 that was not presented in a prior application shall be dismissed unless--
>
> (A) the applicant shows that the claim relies on a new rule of constitutional
> law, made retroactive to cases on collateral review by the Supreme Court, that was
> previously unavailable; or
>
> (B)(i) the factual predicate for the claim could not have been discovered
> previously through the exercise of due diligence; and
>
> (ii) the facts underlying the claim, if proven and viewed in light of the
> evidence as a whole, would be sufficient to establish by clear and convincing
> evidence that, but for constitutional error, no reasonable factfinder would have found
> the applicant guilty of the underlying offense.

Nooner does not rely on a new rule of constitutional law made retroactive to cases on collateral

review.  Instead, he argues that the factual predicate for his claims could not have been discovered

previously through the exercise of due diligence and that the facts underlying the claim are sufficient

to establish by clear and convincing evidence that, but for constitutional error, no reasonable

factfinder would have found him guilty.

Nooner's petition asserts two grounds for relief.  First, Nooner contends that he is actually

innocent and so, pursuant to *Herrera v. Collins*, 506 U.S. 390, 113 S. Ct. 853, 122 L. Ed. 2d 203

(1993), he cannot constitutionally be executed.  Secondly, he contends that his conviction and

sentence are the product of pervasive prosecutorial misconduct that violated the United States

Constitution.

"Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Id*. at 400, 113 S. Ct. at 860; *see also Clayton v. Roper*, 515 F.3d 784, 793 (8th Cir. 2008); *Burton v. Dormire*, 295 F.3d 839, 848 (8th Cir. 2002); *Meadows v. Delo*, 99 F.3d 280, 283 (8th Cir. 1996).

Notwithstanding the statement that claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation, the Supreme Court in *Herrera* stated:

> We may assume, for the sake of argument in deciding this case, that in a capital case a truly persuasive demonstration of "actual innocence" made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim.  But because of the very disruptive effect that entertaining claims of actual innocence would have on the need for finality in capital cases, and the enormous burden that having to retry cases based on often stale evidence would place on the States, the threshold showing for such an assumed right would necessarily be extraordinarily high.  The showing made by petitioner in this case falls short of any such threshold.

*Herrera*, 506 U.S. at 417, 113 S. Ct. at 869.

The Supreme Court also recognized in *Herrera* that a showing of actual innocence may be "a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Id*. at 404, 113 S. Ct. at 862.  In other words, when a petitioner has a constitutional claim that is procedurally barred, proof of actual innocence may overcome the procedural bar.  In subsequent cases, the Supreme Court held "that prisoners asserting innocence as a gateway to default claims must establish that, in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.' " *House v.*

7

*Bell*, 547 U.S. 518, 536-37, 126 S. Ct. 2064, 2076-77, 165 L. Ed. 2d 1 (2006) (quoting *Schlup v.*

*Delo*, 513 U.S. 298, 327, 115 S. Ct. 851, 867, 130 L. Ed. 2d 808 (1995)).

For reasons that will be explained, the "newly discovered evidence" presented by Nooner does not meet the standard adopted by the Supreme Court in *Schlup* and reiterated in *House*, much less does it meet the "extraordinarily high" standard suggested in *Herrera* on the assumption, for the sake of argument, that in a capital case a truly persuasive demonstration of innocence made after trial would render execution of the defendant unconstitutional and would warrant federal habeas relief if there were no state avenue open to process such a claim.

## III.

The first item of evidence that Nooner offers in support of his claim of actual innocence is the testimony of Richard Ian Hartley, Professor of Information Engineering at the Australian National University in Canberra, Australia. Using the latest techniques of photogrammetric computer vision, he estimated the height of the suspect in the surveillance video as follows:

1. The height of the subject (black man) is about 67.6 inches (including correction for his stride), with a standard deviation due to image measurement error of about 0.5 inches. This is a height measurement for the subject wearing hat and shoes.

2. A correction for the shoes and hat is estimated as being about 1.5 inches. This would make the subject about 66.1 inches tall without shoes or hat. This correction is subject to a possible error of up to about 0.4 inches.

3. There is a further possible error of up to 0.2 inches due to inaccuracies in measuring the position of the vertical vanishing point.

4. Taking all these effects into account, the subject's height is estimated as being 66.1 inches, with a possible error of about 1.1 inches.

According to Nooner's petition, Dr. Hartley's calculation proves that Nooner was not the person in the surveillance tape.  Nooner has attached to his petition an admission summary from the Arkansas Department of Correction listing his height as 5 feet 9 inches.[1]  He has also attached to his petition a photograph of Rockett taken at the Garland County Detention Center showing Rockett's height measurement as 66 inches.  Thus, Nooner argues, Dr. Hartley's analysis confirms that Rockett was the person in the surveillance video, not Nooner.

Despite the fact that the mathematical techniques used by Dr. Hartley are new,[2] the evidence that he presents is not newly discovered evidence that could not have been discovered previously through the exercise of due diligence.  While the mathematical techniques used by Dr. Hartley were developed after Nooner's trial in September 1993, the evidence is not the mathematical technique but the height of the murderer.  In 1993, the height of the murderer could have been ascertained in a much simpler manner.  The expert for the State at the evidentiary hearing on this issue, John C. Russ, testified that the height of the murderer could have been determined in 1993 by going to the laundromat, placing a surveyor's ruler at the same place where the murderer had been standing in one of the frames of the surveillance video, and using the same camera in the same position pointed

---

[1] An arrest summary of the Little Rock Police Department shows that Nooner listed his height as 5 feet 8 inches.

[2] Dr. Hartley's report cites the following references: RICHARD HARTLEY & ANDREW ZISSERMAN, MULTIPLE VIEW GEOMETRY IN COMPUTER VISION (2d ed. 2004); RICHARD HARTLEY & ANDREW ZISSERMAN, MULTIPLE VIEW GEOMETRY IN COMPUTER VISION (1st ed. 2000);  A. Criminisi, I. Reid & A. Zisserman, *Single View Metrology*, 40 INT'L J. OF COMPUTER VISION 123, 123-48 (2000); N. Krahnstoever & P. Mendonca, "Bayesian Autocalibration for Surveillance," Proceedings of the International Conference on Computer Vision (2005); A. Criminisi, "Single-View Metrology: Algorithms and Applications," Pattern Recognition: 24th DAGM Symposium in Zurich, Switzerland (September 2002); A. Criminisi, I. Reid & A. Zisserman, "Single View Metrology," Proceedings of the International Conference on Computer Vision (September 1999); "Notes on Single-View Height Measurements."

in the same direction, thereby capturing the surveyor's ruler in that position and then superimposing that image photographically on the image showing the murderer. By that method, the height of the murderer could have been ascertained precisely. During rebuttal testimony, the Court asked Dr. Hartley whether, if the laundromat were still in the condition that it had been in on March 16, 1993, and the camera were in the original position, a ruler could be used to ascertain the height of the murderer in a way that would be more precise than photogrammetric computer vision techniques. Dr. Hartley agreed that if the camera had not been moved and was pointing in exactly the same direction, and if the tile floor were the same, the technique that Dr. Russ proposed could determine the height of the murderer with precision. He stated in his testimony, "Had it been done the day of the murder, then we would have much better information."

A ruler cannot be used now because the laundromat was remodeled in 2002, and all of the physical objects that could have been used as landmarks to determine the precise place at which the murderer was standing in a given frame are no longer there. Before the remodeling and replacement of the objects in the laundromat, Dr. Hartley's sophisticated methods of estimating the height of the murderer in the surveillance video were not necessary. That they are necessary now does not make the height of the murderer newly discovered evidence that could not have been discovered previously through the exercise of due diligence.

Furthermore, Dr. Hartley's presentation, while sophisticated and impressive, fails to convince that the height of the murderer is 66.1 inches. To take the most obvious point, Dr. Hartley's computation fails to take into account the fact that the murderer in the surveillance video was not standing with his spine perpendicular to the floor. He was walking, and it appears that he had his torso leaning forward from the waist and his head leaning forward from the neck. In the frame that

10

Dr. Hartley used to estimate the height of the murderer, the murderer was in full stride with his left foot on the floor behind him and his right foot on the floor in front of him.  Using Pythagoras' theorem, Dr. Hartley calculated that the spread of the legs at that point caused the murderer's hips to be 0.8 inches lower than they would be if the feet were not spread apart.  Dr. Hartley did not, however, adjust his estimate for the fact that the murderer was bending forward to some extent at the waist and at the neck.  To put it another way, the murderer was not marching with a stiff back as though he were a soldier on parade; he was in the midst of an armed robbery and slightly crouched as one would expect of a person prepared to move quickly.  Simply from viewing the surveillance video, one cannot determine how much would be added to the subject's height if he were standing at attention with his feet together and his back and neck straight (as Rockett appears to be in the photograph showing his height to be 66 inches), but it is entirely possible that a change in the subject's posture could add two to three inches to his height.  If so, Dr. Hartley's calculation of the height of the subject after correcting for posture would be closer to 68 or 69 inches, which is Nooner's height, than to 66 inches, which is Rockett's height.

One of the reasons that Dr. Hartley's analysis fails to convince is that he did not apply his techniques to any object in the surveillance video the height of which could be independently determined.  To use Dr. Russ's term, we cannot know the extent to which Dr. Hartley's calculations correspond to "ground truth."  Dr. Hartley testified that the height of the objects in the surveillance video could not be independently ascertained and, thus, none of the objects was an appropriate subject for applying his techniques.  His testimony ignored the fact that his technique could have been applied to Scot Stobaugh.  The medical examiner who performed the autopsy testified at trial that Scot Stobaugh was 70 inches tall.  If Dr. Hartley had applied his methods both to the murderer

11

and to Scot Stobaugh, it would be possible to judge the accuracy of Dr. Hartley's estimate of the height of the murderer by comparing it to the accuracy with which he calculated the height of Scot Stobaugh.  Stobaugh, like the murderer, was wearing shoes and a hat; he was walking; and he was slightly bent at the waist and neck.  Many of the adjustments that Dr. Hartley had to make to calculate the height of the murderer would have been the same when applied to Stobaugh.  If Dr. Hartley had performed his calculations and determined that Scot Stobaugh was 70 inches tall while concluding that the murderer was 66 inches tall, the latter calculation would be more convincing; but no calculation was performed by which the accuracy of Dr. Hartley's estimate of the murderer's height can be judged.

In viewing the video, it appears that the murderer and Stobaugh are approximately the same size.  As noted, the autopsy report stated that Stobaugh was 70 inches tall and weighed 171 pounds.  The admission summary of the Arkansas Department of Correction stated that Nooner was 5 feet 9 inches tall and weighed 164 pounds, which would mean that Nooner was nearly the same size as Stobaugh.  On the other hand, an arrest report dated March 25, 1993, reported that Rockett was 5 feet 6 inches tall and weighed 115 pounds, which would mean that Rockett was much smaller than Stobaugh.  (Pet'r Ex. 4.)

In summary, Dr. Hartley's estimate of the height of the murderer fails to persuade the Court that, had his calculation been presented to a jury, it is probable that no reasonable jury would have found that Nooner murdered Scot Stobaugh.

Nor do the declarations of Rockett and Antonia Kennedy persuade the Court that it is probable that no reasonable jury would have convicted Nooner.  Rockett signed two declarations on August 8, 2007.  One declaration is typewritten; the other is handwritten.  In the typewritten

declaration, Rockett said that he never saw a wallet or a checkbook that belonged to Scot Stobaugh and that he had no idea where the story came from that those items were taken from the robbery and shooting at the FunWash laundromat.  He said that he never had them in the car that he was driving where someone else could have seen them.  In the handwritten declaration, however, he said that he is the one who gave Nooner the checkbook to show to Antonia Kennedy.  At the evidentiary hearing, he testified that the typewritten declaration was wrong on that point.  In his handwritten declaration, Rockett said that he was lying in the floor of the Jacksonville jail on March 30, 1993, when he heard Nooner talking to police and apparently placing the blame on him with regard to a robbery in Jacksonville.  Rockett testified that it was at that time that he decided he needed to place the blame for the murder of Scot Stobaugh on Nooner so as to keep Nooner from "snitching" on him.  Apart from the fact that it makes no sense for Rockett to "snitch" on Nooner regarding the FunWash laundromat in order to keep Nooner from "snitching" on him regarding the Stax robbery, Rockett's first statement regarding Nooner's murder of Scot Stobaugh was given on March 27, 1993, three days before Rockett says he first conceived of the idea of blaming Nooner for the Scot Stobaugh murder.  Rockett's declarations are inconsistent and unpersuasive.

Rockett's testimony is also inconsistent with the facts as shown in the surveillance video. First, the murderer appears in the surveillance video to be right-handed, whereas Rockett admitted in his testimony at the evidentiary hearing that he is left-handed.  Secondly, the surveillance video shows that the vehicle used by the murderer and his accomplice began to move while the murderer was still inside the laundromat, which means that the person who committed the murder was not driving the vehicle.  Those conclusions are based on the following observations from the surveillance video:

13

| 1:32:55[3] | Stobaugh enters the laundromat. |
|---|---|
| 1:33:38 | Stobaugh looks out the window as though someone has driven up. |
| 1:33:41 | The headlight of a vehicle appears facing the laundromat.[4] |
| 1:33:46 | The murderer enters the FunWash laundromat. |
| 1:33:49 | Stobaugh turns to walk toward the rear of the laundromat with the murderer following him. |
| 1:33:52 | Stobaugh has his hands up. |
| 1:33:53 | Stobaugh has his hands down.[5] |
| 1:33:55 | Stobaugh and the murderer start to turn between the second and third rows of washers. |
| 1:33:57 | Stobaugh and the murderer have turned toward the aisle between the second and third rows of washers and are standing between the tables at the end of the rows of washers. |
| 1:33:59 | Stobaugh is out of the picture.  The right hand of the murderer is extended forward and is out of the picture.  The left hand is extended backward and is empty. |
| 1:34:03 | The headlight of the vehicle begins to move as though the vehicle were backing out of the parking space. |
| 1:34:19 | The murderer leaves the laundromat. |

The posture of the murderer at 1:33:59 appears to be the posture of a man using his right hand extended forward to take action *vis-a-vis* Stobaugh.  In that frame, the murderer's left hand is empty and is extended behind the murderer apparently to maintain balance.  Within four seconds after the assailant is seen in that posture, the vehicle from which the assailant emerged starts to move.  These two facts together suggest that the shooting occurred at 1:33:59 or immediately thereafter.  The murderer did not exit the FunWash until 1:34:19, so it is apparent that the murderer was not the driver of the vehicle.  Rockett testified that he never permitted Nooner to drive.  Antonia

---

[3] These are the times as shown on the surveillance tape.

[4] It appears to be the headlight of the passenger side of the vehicle with the driver's side of the vehicle obscured from the vision of the surveillance camera by a row of dryers.

[5] Rockett stated in his 1993 statement to the police that when Nooner went in, Stobaugh put his hands up, and Nooner started walking him toward the back of the laundromat and made him put his hands down.

Kennedy testified that Nooner told her that Stobaugh's body jerked and moved. There was evidence that the murderer searched Stobaugh's pockets after shooting him—hence the apparent delay of sixteen seconds from the shooting until the murderer left the laundromat. The observations from the surveillance video are inconsistent with Rockett's belated claim that he, not Nooner, murdered Scot Stobaugh because (1) the murderer apparently was right-handed while Rockett is left-handed and (2) the driver of the vehicle started to move the vehicle while the murderer was still inside. On the other hand, those observations are consistent with the account of the murder that Rockett gave to the police in March 1993 and to the court at his guilty plea in January 1994.

Antonia Kennedy's statement likewise fails to convince. Antonia Kennedy had told police before the Nooner trial that Nooner admitted to her that he had committed the murder of Scot Stobaugh. She also testified that she saw a checkbook in the car with Nooner and Rockett, and the checkbook bore the name of Scot Stobaugh. Between the time she gave that statement to police and the time of the Nooner trial, Nooner's defense lawyers sent an investigator to take a statement from her on videotape. In that videotaped statement, Kennedy recanted what she had said to the police and stated that she had been lying to the police because they pressured her to do so. Then, at trial Kennedy testified in a manner consistent with the statement that she had given to the police. It was brought out at trial that she had already recanted that statement once. At trial she said that she was lying to the investigator and telling the truth to the police. In her declaration of August 21, 2007, Kennedy recanted her first account for the second time; she said that it was Rockett, not Nooner, who confessed to the murder of Scot Stobaugh. Kennedy's declaration is inconsistent with Rockett's declarations because Rockett says that he "poisoned" Kennedy's mind to make her believe that Nooner was the murderer. Rockett testified at the evidentiary hearing that he did not tell Kennedy

15

that he had killed Scot Stobaugh, while Kennedy testified that he did.  Both of them agree, however, that Nooner bragged to Kennedy that he was the person who shot Scot Stobaugh, so both of them agree that Nooner confessed to being the murderer, even though both of them now say that they did not believe Nooner.

Recantation testimony is viewed with suspicion.  Justice Brennan explained:

Recantation testimony is properly viewed with great suspicion.  It upsets society's interest in the finality of convictions, is very often unreliable and given for suspect motives, and most often serves merely to impeach cumulative evidence rather than to undermine confidence in the accuracy of the conviction.

*Dobbert v. Wainwright*, 468 U.S. 1231, 1233-34, 105 S. Ct. 34, 36, 82 L. Ed. 2d 925 (1984) (Brennan, J., dissenting); *see also United States v. Dogskin*, 265 F.3d 682, 685 (8th Cir. 2001) (the Eighth Circuit looks upon recantation with suspicion); *Hall v. Lockhart*, 806 F.2d 165, 168 (8th Cir. 1986) (recantation by prosecution witnesses are viewed with suspicion).

In view of the evidence as a whole, the "newly discovered evidence" offered by Nooner at this point is not "sufficiently persuasive to enable the court to say that the witness's testimony would probably produce an acquittal at a new trial."  *United States v. Grey Bear*, 116 F.3d 349, 351 (8th Cir. 1997).  Two witnesses other than Antonia Kennedy positively identified Nooner as the person who appeared in the surveillance tape with Scot Stobaugh on the night of the murder.  Those witnesses identified Nooner not only based on his physical appearance but also based on his clothing.  The suspect in the surveillance video was wearing a jacket and a baseball cap that these witnesses testified that Nooner commonly wore.  Antonia Kennedy testified at trial that Nooner confessed to her that he committed the murder.  In her testimony at the evidentiary hearing before this Court, she again stated that Nooner had boasted about murdering Scot Stobaugh.  Rockett, while claiming that

16

he was the murderer, also says that Nooner boasted about being the person who murdered Scot Stobaugh.   It is certain that the murderer was either Rockett or Nooner.   It appears from the surveillance video that the murderer was right-handed.   Rockett testified that he is left-handed, which means that the murderer in the surveillance video must have been Nooner.   The murderer appears in the surveillance video to be nearly as large as Stobaugh, who was 70 inches tall and weighed 171 pounds, which is consistent with the identification of the murderer as Nooner (69 inches tall, weighing 164 pounds) rather than Rockett (66 inches tall, weighing 115 pounds).   Rockett also testified that he never allowed Nooner to drive, but the surveillance video shows that the vehicle used by Nooner and Rockett on the night of the murder began to move while the murderer was still inside the laundromat, apparently just after the shooting.   Rockett's testimony is suspect because he has already been convicted and sentenced in connection with the murder of Scot Stobaugh, so by virtue of his constitutional right not be tried twice for the same offense, he has no risk in claiming to be the murderer.   A reasonable jury in reviewing the surveillance video and the results of Dr. Hartley's calculations could determine that the murderer was closer to 69 inches (the height of Nooner) than to 66 inches (the height of Rockett) because Dr. Hartley calculated the height of the murderer as 66.1 inches without making an adjustment for the murderer's posture.   A reasonable jury easily could conclude that, after an adjustment for the posture, the murderer must have been 68 or 69 inches tall (which would mean that Dr. Hartley's analysis inculpates rather than exculpates Nooner).   Finally, it should be noted that the evidence upon which Nooner now relies to show his innocence contradicts rather than supplements the evidence upon which he relied at trial.   At trial, Nooner's defense relied on evidence that he was at home in bed at the time of the murder.   The

evidence upon which he relies now purports to show that he was in the vehicle at the FunWash laundromat, not at home in bed, when the murder occurred.

The duty of the Court "is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors." *House*, 547 U.S. at 538, 126 S. Ct. at 2077. Nooner has the burden of establishing that, in the light of the new evidence, it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt. *Schlup*, 513 U.S. at 327, 115 S. Ct. at 867. Nooner has failed to meet that burden. Thus, he has failed to meet his burden of establishing actual innocence as a gateway through which he may pass to have his otherwise barred claims considered on the merits. It follows *a fortiorari* that he has failed to meet what would be a much higher burden for a freestanding claim of actual innocence, assuming *Herrera* could be read to allow such a claim. *See Herrera*, 506 U.S. at 417, 113 S. Ct. at 869.

## IV.

In addition to his claim of actual innocence, Nooner asserts that his trial was marked by pervasive prosecutorial misconduct. This claim fails under 28 U.S.C. § 2244(b)(2)(B)(i), which provides that in a second or successive petition the petitioner must present a factual predicate for the claim that could not have been discovered previously through the exercise of due diligence. Of the several instances of alleged prosecutorial misconduct, the only one that Nooner arguably could not have discovered previously through the exercise of due diligence is the claim in Antonia Kennedy's declaration of August 21, 2007, that (unnamed) law enforcement authorities forced her to testify falsely. At the evidentiary hearing before this Court, the Court specifically asked Kennedy whether any law enforcement officer had asked her to tell lies in court, and she said that no law enforcement

officer had ever asked her to lie in court.  She told the Court that she had always told the law enforcement officers that it was Nooner who shot Scot Stobaugh, that the law enforcement officials did not know who did it, and that they did not instruct her to testify it was Nooner rather than Rockett who did it.  On the basis of Kennedy's testimony before this Court, the Court could not find that law enforcement officials ever directed Kennedy to testify falsely at Nooner's trial.

Nooner claims that Antonia Kennedy was given leniency in return for testifying against him. Although it appears from the trial transcript that defense counsel were aware that Kennedy was to receive leniency in return for her testimony, assuming that a *Brady* violation nevertheless occurred, it certainly could have been discovered by the exercise of due diligence long before the present petition was filed.  Nooner also argues that a firearms expert, Ronald Andrejack, testified falsely that Scot Stobaugh was murdered with a .22 caliber Ruger pistol.  In reviewing the transcript, it does not appear that Andrejack testified falsely; but assuming that he testified falsely, and assuming that the prosecutors knew that he testified falsely, that fact could have been discovered through the exercise of due diligence long before the present petition was filed.  Nooner's claims of prosecutorial misconduct could have been discovered and presented in his first petition.  Therefore, he fails to meet the standard under 28 U.S.C. § 2244(b)(2)(B)(i).  Consequently, Nooner's petition must be dismissed.  28 U.S.C. § 2244(b)(4).

## V.

The State filed a motion *in limine* to exclude the testimony of Dr. Hartley.  That motion is denied.  Document #34.  The State has filed a motion to strike a letter written to the Court by Dr. Hartley after the evidentiary hearing in which Dr. Hartley attempted to amend his testimony.  The Court announced at the conclusion of the evidentiary hearing that the evidence was closed on that

19

issue. The motion to strike is granted. Document #56. Nooner has filed a motion to strike the testimony of John C. Russ. The only portions of the testimony of Dr. Russ upon which the Court has relied are the portions specifically referenced above. On those points referenced above, the Court finds that Dr. Russ is qualified to testify and that his testimony meets the standard of Rule 702 of the Federal Rules of Evidence, and so the motion is denied. The motion is otherwise denied as moot. Document #63.

## CONCLUSION

In summary, Nooner's freestanding claim of actual innocence is denied because claims of actual innocence do not state a ground for habeas relief absent an independent constitutional violation in the state proceeding. Even if a claim of actual innocence stated a claim for habeas relief apart from an independent constitutional violation, Nooner has failed to meet the extraordinarily high standard for proving such a claim hypothesized by the Supreme Court in *Herrera*. He has also failed to show that, in light of the new evidence, it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt. Hence, he has failed to meet the *Schlup* standard for providing actual innocence as a gateway to having a procedurally barred claim heard on the merits. Nooner's claims of prosecutorial misconduct fails under 28 U.S.C. § 2244(b)(2)(B)(i). Therefore, the petition for writ of habeas corpus is denied. Document #2.

IT IS SO ORDERED this 11th day of January, 2010.

J. LEON HOLMES
UNITED STATES DISTRICT JUDGE

20